RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0190p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 19-1003

TRAMAIN HILL,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:18-cr-00028-1—Gordon J. Quist, District Judge.

Argued: December 12, 2019

Decided and Filed: June 25, 2020

Before: COLE, Chief Judge; SILER and MURPHY, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Sean R. Tilton, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Grand Rapids, Michigan, for Appellant. Davin M. Reust, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Sean R. Tilton, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Grand Rapids, Michigan, for Appellant. Davin M. Reust, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

MURPHY, J., delivered the opinion of the court in which COLE, C.J., joined. SILER, J. (pp. 15–16), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

MURPHY, Circuit Judge.   In the interpretation of a legal text, as in an ordinary conversation, the way in which a drafter (or speaker) uses an indeterminate word is critical for deciding the word's meaning on a particular occasion.   That is true for the phrase we must interpret in this case: "different location."  Consider this phrase in relation to a store.  Depending on the context, the phrase could refer to a distinct place within the store or to a separate place outside it.   Suppose, for example, a friend says to you while cellphone shopping, "The cellphones used to be right here, but must have been moved to a different location."  You would likely take your friend to be referring to a different area within the store.  Suppose instead your friend says, "We have to go to a different location because the cellphone I want is out of stock." You would likely take your friend to be referring to a different store.  Context is key to meaning.

We must apply this interpretive insight to a provision of the U.S. Sentencing Guidelines that has engendered a broad circuit split.  A robbery guideline enhances the base offense level by four if a victim "was abducted to facilitate commission of the offense[.]"   U.S.S.G. § 2B3.1(b)(4)(A) (2018).  The guidelines commentary defines "abducted" to mean "that a victim was forced to accompany an offender to a different location." *Id.* § 1B1.1 cmt. n.1(A).  This case asks whether robbers accompanied their victims to a "different location" when they forced the victims from a cellphone store's sales floor to its back room in order to tie them up.  In the context of this "abduction" enhancement, we think the phrase "different location" is best read to refer to a place different from the store that is being robbed.  And a store's back room does not qualify as a "different location" from the store.  The facts of this case instead trigger a related two-level enhancement that applies when robbers have "physically restrained" their victims. *Id.* § 2B3.1(b)(4)(B).  We thus reverse the district court's judgment and remand for resentencing.

I

Around 6:50 p.m. on August 27, 2016, three employees and a customer—the soon-to-be victims of a frightening armed robbery—were going about their business inside a relatively small

Universal Wireless store in Coldwater, Michigan. (Universal Wireless is a Sprint retailer.) Two men, their faces obscured, entered. One pointed a semi-automatic weapon at the victims while the other locked the store's front door. The men led the victims from the sales floor to a back breakroom at gunpoint. Inside the back room, they forced the victims to lie face-down on the floor and bound their wrists and ankles with zip ties. The victims immobilized, the robbers looted the store of its cash and cellphones and took the customer's purse. They then scrambled out the back door to a waiting getaway car driven by a third robber. All told, the robbers made off with cellphones and cash worth $42,129.44.

Tramain Hill was one of the robbers. He pleaded guilty to Hobbs Act robbery (and aiding and abetting Hobbs Act robbery) in violation of 18 U.S.C. §§ 1951 and 2. Before sentencing, Hill's presentence report suggested increasing his base offense level by four under an enhancement that applies when victims were "abducted to facilitate commission of the offense or to facilitate escape[.]" U.S.S.G. § 2B3.1(b)(4)(A). Hill objected, arguing that he should receive only a two-level enhancement that applies when victims were "physically restrained to facilitate commission of the offense or to facilitate escape[.]" *Id.* § 2B3.1(b)(4)(B). At sentencing, the district court applied the four-level enhancement. The Fifth Circuit had applied the enhancement to a defendant who engaged in similar robberies, and the district court found that interpretation persuasive. *See United States v. Buck*, 847 F.3d 267, 276–77 (5th Cir. 2017). It selected a sentence of 130 months' imprisonment, at the bottom of Hill's guidelines range of 130 to 162 months. If the court had instead applied the two-level physical-restraint enhancement, Hill's guidelines range would have been 110 to 137 months. *See* U.S.S.G. Chapter 5, Part A (Sentencing Table).

II

Hill renews his challenge to the four-level abduction enhancement. We start with our standard of review. The parties do not dispute the historical facts: two armed robbers entered a Universal Wireless store, took four victims from the sales floor to a back room at gunpoint, tied the victims up with zip ties, grabbed cellphones and cash, and exited out the back door. The parties instead dispute the legal significance of these facts: Do they show that the victims were "abducted" within the meaning of U.S.S.G. § 2B3.1(b)(4)(A)? In similar cases, courts have

reviewed this question de novo.  *See, e.g.*, *United States v. Archuleta*, 865 F.3d 1280, 1285–88 (10th Cir. 2017); *United States v. Eubanks*, 593 F.3d 645, 652–54 (7th Cir. 2010).

That makes sense.  The issue in this case concerns "the application of the guideline to the facts"—that is, a "mixed question of fact and law."  *United States v. Thomas*, 933 F.3d 605, 608 (6th Cir. 2019) (citation omitted).  The standard of review for that kind of question depends on the circumstances in which it arises, *see U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 966–67 (2018), and the circumstances here point to non-deferential review.  The issue turns mostly on "the meaning of the words" in a guideline, a classic interpretive question that courts review de novo.  *United States v. Bolden*, 479 F.3d 455, 461 n.1 (6th Cir. 2007); *U.S. Bank*, 138 S. Ct. at 965.  And because the issue arises often in somewhat similar factual settings, non-deferential review will "unify precedent" and ensure that like defendants are treated alike. *See Ornelas v. United States*, 517 U.S. 690, 697 (1996).  We thus review the question de novo.

A

The robbery guideline—§ 2B3.1—contains the enhancement at issue in this case.  It states: "(A) If any person was abducted to facilitate commission of the offense or to facilitate escape, increase [the base offense level] by 4 levels; or (B) if any person was physically restrained to facilitate commission of the offense or to facilitate escape, increase by 2 levels." U.S.S.G. § 2B3.1(b)(4).  The commentary to this guideline directs readers to § 1B1.1 for the definitions of "abducted" and "physically restrained."  *Id.* § 2B3.1 cmt. n.1.  Section 1B1.1's commentary, in turn, defines "abducted" as follows: "'Abducted' means that a victim was forced to accompany an offender to a different location.  For example, a bank robber's forcing a bank teller from the bank into a getaway car would constitute an abduction."  *Id.* § 1B1.1 cmt. n.1(A). And the commentary defines "physically restrained" as follows: "'Physically restrained' means the forcible restraint of the victim such as by being tied, bound, or locked up."  *Id.* § 1B1.1 cmt. n.1(L).

We begin by clarifying the narrow scope of the parties' debate.  While guidelines commentary binds us "only 'if the guideline which the commentary interprets will bear the construction,'" *United States v. Havis*, 927 F.3d 382, 386 (6th Cir. 2019) (en banc) (per curiam)

(citation omitted), neither party challenges the commentary's definitions in this case. So we may assume that the commentary permissibly interprets "abducted." In addition, the parties agree that the robbers' conduct here meets the physical-restraint definition and so subjects Hill to at least the two-level enhancement in § 2B3.1(b)(4)(B). For purposes of the "abducted" definition, they also agree that the victims were "forced to accompany" the robbers from the store's sales floor to its back room. U.S.S.G. § 1B1.1 cmt. n.1(A). And they agree that this forced accompaniment was done "to facilitate commission of the offense." *Id.* § 2B3.1(b)(4). The parties thus agree on just about everything except whether the store's back room qualifies as a "different location" from its sales floor within the meaning of the "abducted" definition. We are left with the discrete task of deciding whether the Universal Wireless store itself counts as the victims' initial "location" (in which case the robbers did not take them to a "different" location) or whether the victims' precise place on the sales floor counts as their initial "location" (in which case they did).

A "split of authority" has developed over "whether the forced movement of victims from one room or area to another room or area within the same building constitutes an abduction for purposes of § 2B3.1(b)(4)(A)." *Archuleta*, 865 F.3d at 1285. Some courts hold that the customer area of a store or bank typically will not qualify as a "different" location from the back room or vault area of that store or bank. *See United States v. Whatley*, 719 F.3d 1206, 1221–23 (11th Cir. 2013); *Eubanks*, 593 F.3d at 652–54; *see also Archuleta*, 865 F.3d at 1292–95 (Seymour, J., concurring in part and dissenting in part); *United States v. Reynos*, 680 F.3d 283, 292–96 (3d Cir. 2012) (Ambro, J., dissenting). Others hold that any different "position" in a building counts as a "different location." *Archuleta*, 865 F.3d at 1285–88; *see United States v. Buck*, 847 F.3d 267, 276–77 (5th Cir. 2017); *Reynos*, 680 F.3d at 289–91; *United States v. Osborne*, 514 F.3d 377, 389–90 (4th Cir. 2008). While both sides of this debate make sound legal points, we agree with those courts that have interpreted this guideline to mean that one area in a robbed store or bank generally will not qualify as a "different location" from another area of that same store or bank.

As always, we must start with the text—here, the phrase "different location." To determine the ordinary meaning of a phrase, "dictionaries are a good place to start." *United*

*States v. Zabawa*, 719 F.3d 555, 559 (6th Cir. 2013). And we look to dictionaries that defined the relevant words when the Sentencing Commission initially used them in 1987. *See Whitfield v. United States*, 574 U.S. 265, 267 (2015). Dictionaries at that time defined "location" to mean, among other things, "a place of settlement, activity, or residence," *The Random House Dictionary of the English Language* 1128 (2d ed. 1987), "[t]he fact or condition of occupying a particular place," 8 *The Oxford English Dictionary* 1082 (2d ed. 1989), or the "[s]ite or place where something is or may be located," *Black's Law Dictionary* 951 (6th ed. 1990). And they defined "different" to mean "not identical; separate or distinct." *Random House*, *supra*, at 552; *see also* 4 *Oxford English Dictionary*, *supra*, at 638. A "different location" thus is a separate or distinct place or site.

Truth be told, though, these dictionary definitions do not take us very far. Depending on how the phrase is used, "different location" could mean a site as far away as the moon or as close as a hair's breadth. Consider a few examples. When Congress passed a safe harbor clarifying that nothing in Title VII bars employers from using different pay standards for employees who "work in different locations," was Congress referring to employees in adjoining offices or at separate worksites? 42 U.S.C. § 2000e-2(h); *cf. Candelario Ramos v. Baxter Healthcare Corp. of Puerto Rico, Inc.*, 360 F.3d 53, 61–62 (1st Cir. 2004). If house-hunters ask their real-estate agent to see listings in a different location, would the agent take them to houses in the same subdivision or across town? If a coworker tells you that she has to deposit her paycheck at a different location this week, would she be visiting a different teller window or bank branch? In each of these examples, "location" is best read at the higher level of generality: a different worksite, subdivision, or bank. But it is not hard to imagine counterexamples that call for a more precise reading. If a grocery-store employee tells a customer that the bread has been moved to a "different location," the employee would likely be referring to a different aisle, not a different store. Or if a bailiff tells a member of the public mistakenly sitting in reserved seats to please move to a "different location," the bailiff would likely be referring to a different area in the courtroom, not a different courtroom. In short, the phrase "different location"—by itself—is inherently vague because it can "be interpreted at many different levels of generality." *Whatley*, 719 F.3d at 1222.

This case thus epitomizes what one committed textualist has said about statutory interpretation: "In interesting cases, meaning is not 'plain'; it must be imputed; and the choice among meanings must have a footing more solid than a dictionary—which is a museum of words, an historical catalog rather than a means to decode the work of legislatures." Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 Harv. J. L. & Pub. Pol'y 61, 67 (1994). The range of meanings for the phrase "different location" suggests that context, a "primary determinant of meaning," must play the crucial role. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012). This bedrock principle has especial force for "common words" like location because they are "inordinately sensitive to context." *Smith v. United States*, 508 U.S. 223, 245 (1993) (Scalia, J., dissenting); *cf. Jennings v. Rodriguez*, 138 S. Ct. 830, 845 (2018) ("for"); *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 630 (2018) ("under"). So we must examine the whole text and structure to decide how a "normal speaker of English" would understand the words "different location" in the "circumstances in which they were used." Oliver Wendell Holmes, *The Theory of Legal Interpretation*, 12 Harv. L. Rev. 417, 417–18 (1899).

Considering the issue from that perspective, what level of generality best fits the phrase "location" in this specific robbery enhancement? The spot at which a robber finds a victim, such that moving to any other spot in a room is to a different location? The room in which the robber finds the victim, such that moving to another room is to a different location? The store in which the robber finds the victim, such that moving in or out of the store is to a different location? *Cf. Archuleta*, 865 F.3d at 1293 (Seymour, J., concurring in part and dissenting in part). For the following reasons, we conclude that the phrase "different location" in this context generally should refer to a place other than the store being robbed, not to a separate area or spot within that store.

*First*, we must place § 1B1.1's general definition of "abducted" in the specific context of § 2B3.1(b)(4)'s enhancement. "Location" can mean the "place of . . . [an] activity," *Random House*, *supra*, at 1128, and the activity in this case is a robbery. When individuals describe the "location" that has been robbed, they typically refer to the store, bank, or business that was robbed. Ordinary speakers would say that a person robbed the "Universal Wireless" more

readily than they would say that the person robbed the "sales floor" of the Universal Wireless. So in this context of victims in a store or bank being robbed, the store or bank is the most natural "location." *Whatley*, 719 F.3d at 1222. And "[t]he ordinary meaning of the term 'different location' would not apply to each individual office or room" of that store or bank. *Id.* Put differently, the "common sense meaning of 'different location'"—when used in this specific robbery context—"is anywhere in the world that is not the place just robbed." *Archuleta*, 865 F.3d at 1293 (Seymour, J., concurring in part and dissenting in part).

*Second*, we must interpret "different location" in a way that best comports with the rest of the commentary's "abducted" definition. If we interpret the phrase too narrowly, we risk reading it out of the definition altogether—something we try to avoid. *See Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1323 (2020); Scalia & Garner, *supra*, at 174. Even without "different location," the definition of "abducted" already requires that a victim be forced to "accompany" an offender. U.S.S.G. § 1B1.1 cmt. n.1(A). And the verb "accompany" itself denotes some movement. A similar federal statute, for example, increases the sentence for bank robbery when a defendant "forces any person to accompany him" during a robbery. 18 U.S.C. § 2113(e). The Supreme Court held that while the verb "accompany" does not "connote movement over a substantial distance," it does require more than "minimal movement—for example, the movement of a bank teller's feet when the robber grabs her arm." *Whitfield*, 574 U.S. at 267–68. The verb entails "movement that would normally be described as from one place to another, even if only from one spot within a room or outdoors to a different one." *Id.* The Court listed as an example a victim accompanying a robber "from one area within a bank 'to the vault.'" *Id.* at 267 (citation omitted). If the Sentencing Commission meant for that short movement to count, it had no reason to add the phrase "different location." By interpreting "different location" at the higher level of generality, we ensure that the phrase has "independent meaning." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 163 n.20 (2012); Scalia & Garner, *supra*, at 176.

*Third*, this interpretation comports with the example that the commentary's definition identifies as a qualifying "abduction." After defining "abducted," the commentary adds: "For example, a bank robber's forcing a bank teller from the bank into a getaway car would constitute

an abduction." U.S.S.G. § 1B1.1 cmt. n.1(A). This example treats the getaway car as the second "location" and so adheres to our view that the place to which a robber accompanies a victim must be different from the robbed store itself. Not only that, the example identifies the customer's initial location as the *bank*—not as, for example, the *bank-teller window*—and so supports the level of generality at which we have defined that "location." And since words are known by the company they keep, we read a word like location, which is "capable of many meanings," "in light of [its] accompanying words in order to avoid giving the statutory [enhancement] 'unintended breadth.'" *Maracich v. Spears*, 570 U.S. 48, 62–63 (2013) (citations omitted); *see Parker v. Met. Life Ins.*, 121 F.3d 1006, 1014 (6th Cir. 1997) (en banc). ("Although most associated-words cases involved listings[,] . . . a listing is not prerequisite." Scalia & Garner, *supra*, at 197.)

*Fourth*, when construing the words "different location," we "cannot forget that we ultimately are determining the meaning of the term" *abducted* in the guideline. *Johnson v. United States*, 559 U.S. 133, 140 (2010) (citation omitted). The word "abducted" signals that a victim has been taken away. To "abduct" typically means "to carry off or lead away (a person) illegally and in secret or by force," as in "to kidnap." *Random House*, *supra*, at 3; 1 *Oxford English Dictionary*, *supra*, at 19; *see also Black's Law Dictionary*, *supra*, at 5 ("abduction"). While most people today would not associate the word with the extended movement required for a common-law kidnapping (movement to a different country, 4 William Blackstone, *Commentaries on the Laws of England* *219), "abduct" still conveys more movement than from a sales floor to a back room. To be sure, some state courts eventually interpreted their kidnapping laws to require only "trivial" movement "from one room to another" within a "place of business"—a development the drafters of the Model Penal Code called an "absurdity." 2 Model Penal Code and Commentaries § 212.1, cmt. 1, at 212, 223 (Am. Law Inst., Official Draft 1980). Whether or not this trivial movement would satisfy a particular state's kidnapping law, we do not think it would have fallen within the usual meaning of the word "abducted." *Cf.* 3 Wayne R. LaFave, *Substantive Criminal Law* § 18.1(b) (3d ed.), Westlaw (database updated Oct. 2019); *State v. Salamon*, 949 A.2d 1092, 1119–20 (Conn. 2008). As another court said, a normal speaker "would conclude that [the robber] had taken the [victims] hostage during the commission of the . . . robberies, but would not describe those employees as having been

abducted or kidnapped." *Whatley*, 719 F.3d at 1223. The Sentencing Commission's use of the verb "abducted" for this enhancement thus helps clarify what it "had in mind" when its commentary used the phrase "different location" to define that verb. *See Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172 (2001) ("*SWANCC*").

*Fifth*, the robbery guideline's structure confirms this view. The Sentencing Commission established two related enhancements. The one for *abducting* a victim generates a four-level enhancement; the other for *physically restraining* a victim generates a two-level enhancement. U.S.S.G. § 2B3.1(b)(4). The two-level difference between these enhancements shows that abduction qualifies as the more serious of the two. Yet movements within a store typically will occur whenever a robber "physically restrains" a victim. The commentary, for example, lists being "locked up" as an example of a physical restraint, *id.* § 1B1.1 cmt. n.1(L), and robbers often must take their victims to the area in which they are "locked up." Treating the movement typically associated with this two-level physical-restraint enhancement as automatically triggering the four-level abduction enhancement would "blur the distinction between physical restraint and abduction." *Whatley*, 719 F.3d at 1223; *see also Eubanks*, 593 F.3d at 654. Not only that, many courts have disagreed over whether "'herding victims into a defined area,' without then physically restraining them in that area," even qualifies for the less-serious *two*-level enhancement. *United States v. Taylor*, __ F.3d __, 2020 WL 2745536, at *7, 9 (2d Cir. May 27, 2020) (quoting *United States v. Herman*, 930 F.3d 872, 875 (7th Cir. 2019)); *cf. United States v. Coleman*, 664 F.3d 1047, 1049–50 (6th Cir. 2012). This debate would be beside the point if, in fact, that type of "herding" alone triggered the more serious *four*-level enhancement.

All of this said, we add one note of caution. We do not dispute that the phrase "different location" is context-dependent and so we do not foreclose the "case-by-case approach" that other courts have taken to this abduction enhancement—one that examines the specific facts, including the type of building and crime at issue. *Whatley*, 719 F.3d at 1222–23; *Osborne*, 514 F.3d at 389–90. But we agree with the Seventh and Eleventh Circuits that the phrase generally will refer to a place separate from the store or bank being robbed. *Whatley*, 719 F.3d at 1222–23; *Eubanks*, 593 F.3d at 653–54. And the specific facts of this case call for that rule. The back room of the Universal Wireless store was part of the robbed location; it was not a "different

location" relative to the store.  So Hill's victims were not "abducted" as that term is used in § 2B3.1(b)(4)(A), and the district court should have applied only the two-level physical-restraint enhancement.

B

The government defends the district court's decision on grounds of both plain meaning and precedent.  Its arguments fail to persuade us.

Start with plain meaning.  The government wants us to start—and end—with dictionary definitions at the expense of contextual factors.  *See Archuleta*, 865 F.3d at 1287.  It notes that a dictionary defines "location" to mean the "particular place or position occupied by a person or thing; precise situation."  *Oxford English Dictionary Online* (3d ed. Dec. 2015).  "Position," in turn, can mean the "place in which a person, thing, etc., is located or has been put," and "place" can mean a "room" or "available space."  *Id.*  According to the government, these definitions show that "location" has one—and only one—meaning: It refers to the specific spot where a person stands.  And the government believes that the victim has moved to a different "location" whenever the victim takes a step.  Indeed, the government forthrightly acknowledged at oral argument that its reading would trigger the abduction enhancement if a robber accompanied the victim the few feet separating the counsel tables in our courtroom.  Oral Arg. 12:35–12:50.

We disagree.  We do not dispute that, when the context indicates, the phrase "location" *can* mean the place at which a person stands.  If your friend calls complaining, "I've waited an hour in this BMV line and I'm still nearly in the same location," she would be referencing her precise spot.  But, as our examples show, the word location need not *always* be understood at that level.  "That a definition is broad enough to encompass one sense of a word does not establish that the word is *ordinarily* understood in that sense."  *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 568 (2012).  The government's view would mean that two workers standing right next to each other on an assembly line were working at "different locations" within the meaning of Title VII's safe harbor for different pay standards.  42 U.S.C. § 2000e-2(h).  And even the government's dictionary does not treat this precise level of generality as the *only* proper level.  Among its usage examples for the word "location," the dictionary cites the following

sentence from a book about Descartes: "To protect his privacy throughout these changes of address, he asked Mersenne not to reveal his location to anyone." *Oxford English Dictionary Online*, *supra*. We doubt it would have been okay for Mersenne to disclose Descartes's general residence so long as he did not disclose his specific room. Indeed, as one dictionary notes for "place" (a word on which the government relies), it is "a very indefinite term" whose "extent . . . must generally be determined by the connection in which it is used[.]" *Black's Law Dictionary*, *supra*, at 1148. The same goes for "location."

The government's exclusive focus on dictionaries leads it to ignore the contextual clues on which we have relied to choose the level of generality for the word "location." The government, for example, nowhere attempts to justify its rule under the ordinary meaning of the word "abducted"—the word actually used in the robbery guideline. Instead, it says that "the commentary already defines 'abducted'" and that the "commentary's definition is authoritative." Ape. Br. 17; *see Archuleta*, 865 F.3d at 1287 n.3. Yet the Supreme Court has repeatedly relied on the ordinary meaning of a statutory word to clarify the meaning of a vague statutory definition of that word. *See Bond v. United States*, 572 U.S. 844, 861–62 (2014) ("chemical weapon"); *Johnson*, 559 U.S. at 140 ("violent felony"); *SWANCC*, 531 U.S. at 172 ("navigable waters"). We should pay special attention to that practice here because the commentary's definition of abducted governs *only* if it comports with the ordinary import of the defined word in the guideline. *See Havis*, 927 F.3d at 386; *see also Kisor v. Wilkie*, 139 S. Ct. 2400, 2414–18 (2019).

The government also sees no need to interpret this abduction enhancement in a manner that meshes with its neighbor—the physical-restraint enhancement. It does not dispute that "physical restraints" often will include movement that satisfies its view of the abduction enhancement. Physical-restraint cases fitting this basic fact pattern are not difficult to find. In one, a robber guided a victim to the cash register. *United States v. Paul*, 904 F.3d 200, 201, 204 (2d Cir. 2018) (refusing to apply physical-restraint enhancement). In others, the robbers took their victims to the bank vault. *United States v. Stevens*, 580 F.3d 718, 719, 721–22 (8th Cir. 2009) (applying physical-restraint enhancement); *United States v. Thompson*, 109 F.3d 639, 640–42 (9th Cir. 1997) (same); *United States v. Jones*, 32 F.3d 1512, 1519 (11th Cir. 1994) (per

curiam) (same); *see also United States v. Montgomery*, 748 F. App'x 668, 673–74 (6th Cir. 2018) (same). In still another, the robber took the victims to a restaurant's freezer. *United States v. Greenstein*, 322 F. App'x 259, 266 (3d Cir. 2009) (same). In all of these cases the government did not even argue for the abduction enhancement, but the defendants' conduct should have triggered it under the government's broad reading in this case. No matter, the government responds, the guidelines are "replete with instances in which more than one enhancement applies," and courts need only pick the greater enhancement. Ape. Br. 18. This misses the point. The phrase "different location" has an "uncertain reach." *Maracich*, 570 U.S. at 65. To decide on its reach, we may look at the apparent design and structure of these two enhancements as a whole. *Id.* And we do not think "different location" should be interpreted so broadly as to encompass large swathes of territory that appear reserved for the physical-restraint enhancement. Such a "clash" between provisions should be avoided when possible. Scalia & Garner, *supra*, at 168.

Turn to precedent. The government concedes that other circuit courts are divided. But it points to several of our own decisions to support its view. *See United States v. Kavo*, 128 F. App'x 447 (6th Cir. 2005); *United States v. Merriweather*, 2000 WL 1290342 (6th Cir. Sept. 8, 2000) (per curiam); *United States v. Greenup*, 1999 WL 506978 (6th Cir. June 7, 1999); *United States v. Williams*, 1998 WL 136550 (6th Cir. Mar. 19, 1998); *United States v. Sawyer*, 1997 WL 608649 (6th Cir. Oct. 1, 1997) (per curiam). Yet none of these nonbinding, unpublished cases involved similar facts—victims being moved within the location being robbed. Three comport with our understanding of the level of generality for "location" because they involved movement between the robbed facility and a different site. *See Merriweather*, 2000 WL 1290342, at *1–2 (parking lot to bank); *Williams*, 1998 WL 136550, at *1 (car to bank); *Sawyer*, 1997 WL 608649, at *1–2 (bank to parking lot). And while the fourth case, *Greenup*, may be in tension with our holding, the government admits that the court's basis for applying the enhancement was "unclear." Ape. Br. 13 n.1. Finally, the last case the government cites involved a different crime and context—aggravated sexual abuse by force, and movement over separate floors of a home. *See Kavo*, 128 F. App'x at 449–52. Under a "case-by-case approach," *Whatley*, 719 F.3d at 1222, this context (a rape rather than a robbery, at a home rather

than a store) may or may not call for a different understanding of "location." We need not decide the issue in this distinct robbery case.

We reverse and remand for resentencing using the two-level physical-restraint enhancement, not the four-level abduction enhancement.

---

**DISSENT**

---

SILER, Circuit Judge, dissenting. The majority has presented a very engaging and intellectual analysis of the application of the Sentencing Guidelines in this case. I do not quarrel with the statement of the facts, but I beg to differ on the application of the enhancement when victims were "abducted to facilitate commission of the offense or to facilitate escape." USSG § 2B3.1(b)(4)(A). The defendant claims that because the four victims in the case were moved only from the sales floor to a back room at gunpoint, tied up, and were in that location when the robbers left through the back door, the sentence does not call for an enhancement because the victims were not forced to leave the building. The parties agree that the commentary to this Guideline defines "abducted" as meaning that a victim was forced to accompany an offender to a different location.

A "different location" could mean that in order to enhance under this criteria, the robbers must have had to go through an outside door. However, as the majority indicates in its opening paragraph, to some persons a different location would not refer to a separate building, but to a different area within the same building. This is the interpretation which is most common in the federal courts, and it is one which I would follow. In other words, if there is a forced movement within the same building in order to facilitate the crime, it is an abduction under the Sentencing Guidelines and calls for a four-level enhancement of the sentence. As the majority indicates, the other criteria of the enhancement have been met. The parties agree that Hill and the other robbers moved the victims from a front room to a back room in order to facilitate commission of the offense. The majority recognizes that in unpublished opinions our court has ruled to the contrary, although the facts were not exactly the same and involved other crimes. In particular, I cite *United States v. Kavo*, 128 F. App'x 447 (6th Cir. 2005), in which a sex offender moved the victim from the main floor of the house to the basement, where the sex offense occurred. I would affirm the district court's sentence by following the decisions in *United States v. Archuleta*, 865 F.3d 1280, 1285-89 (10th Cir. 2017), and *United States v. Reynos*, 680 F.3d 283,

289-91 (3d Cir. 2012).  *See also United States v. Buck*, 847 F.3d 267, 276-77 (5th Cir. 2017); *United States v. Osborne*, 514 F.3d 377, 389-91 (4th Cir. 2008).

I respectfully dissent.